The next matter, number 25-1160, Andrea Beckwith et al. v. Aaron M. Frey. At this time, would counsel for the appellant Frey please introduce himself on the record to begin. Good morning, may it please the Court. I'm Chris Taub, counsel for the appellant, the Attorney General of Maine, Aaron Frey. With the Court's permission, I'd like to ask for three minutes for rebuttal. You may have three minutes. The Maine Legislature enacted a 72-hour waiting period in order to save lives by preventing suicides and homicides. And while the appellees claim that the effectiveness of a waiting period is speculative or a dubious assumption, the undisputed evidence in the record is that waiting periods work. One of our expert witnesses, based both on his own work and published studies, testified that waiting periods meaningfully reduce both homicides and suicides. One study concluded that a waiting period can reduce suicides by 7.4%, given that in Maine in 2021, there were 150 firearm suicides just in that one year. A waiting period could have saved 12 lives. The appellees never controverted any of our experts' testimony. They never designated any of their own experts. And so we submit it's too late in the day for them to question the effectiveness of a waiting period or claim that Maine's only objective is to delay the exercise of Second Amendment rights. That waiting periods are designed to, in fact, prevent impulsive acts of violence means that Maine's waiting period fits comfortably within the category of laws that the Supreme Court approved of in Bruin. There, the Court stated that laws that are designed to prevent dangerous people from carrying firearms are constitutional so long as they employ narrow, objective, and definite standards and are not put to abusive ends. The Court expressly called out laws requiring a person to undergo a background check or pass a firearm safety course before being allowed to carry a firearm in public. These laws are designed to ensure that people will act safely with their firearms before they take possession of them or carry them. Let me just stop you and let's jump right to some of the questions that I think we're going to have to answer. So in step one of the Bruin analysis, you have a specific argument about why keep and bear does not include acquiring or purchasing. What's your best argument on that step one question? So I'm not sure if it's our best argument, but just to start with what the first part of the argument is, which is that the plain text of the Second Amendment talks about the right to keep and bear. And in Howler, the Court said that keep means to have or possess and bear means to carry. So I think that's part one of the argument. Part two is the purpose of the Second Amendment, which was a response to King George III dispossessing people of their firearms. But you've got to be able to get a firearm in some fashion. Yeah, that's certainly correct, Your Honor. But I think what the Fourth Circuit, the Fifth Circuit, the Ninth Circuit, and the Tenth Circuit have all recognized, sort of getting at it in slightly different ways, but all of those courts of appeals have recognized that the plain text of the Second Amendment doesn't directly implicate the acquisition of firearms. But to your point, Your Honor, what it does do is if at some point that kind of restriction functionally prohibits, or in the words of the Ninth Circuit, meaningfully impairs the right of people to exercise their Second Amendment rights, then at that point it would implicate the Second Amendment. And so, for example, if Maine adopted a 25-year waiting period, you know, that gets to then to me. So if I accept all that, then it gets to me, well, what is the right that we're talking about? So let's say for a second we accept meaningfully impairs is the right way to think about this. Then it's the question of, well, keep and bear right now, immediately. Keep and bear once somebody establishes they are law-abiding and responsible. So if this is a precursor question that by its text is outside the Second Amendment, but sometimes meaningfully interferes, I ask meaningfully interfere with what? And yes, we can say the words, but what do you say the right is? So if I understand your question, Your Honor, what we say the course of conduct is here is the course of conduct is the immediate acquisition of a firearm, or at the very least the acquisition of a firearm. So the course of conduct is not keeping and bearing arms. It's, again, either the acquisition or the immediate acquisition. But if the right is, if meaningfully interferes is what we're going to ask, and the right is possess it or carry it now, then it seems to me this acquisition limitation does meaningfully interfere with that. If it's, on the other hand, meaningfully interfere with my right to keep and bear defined as I can keep and bear after I've demonstrated I am law-abiding and responsible, and that this regulation goes at that question, maybe it's different. So that's, I guess, what I'm trying to understand. So Your Honor, I think in Bruin, in the footnote, what the Supreme Court was saying is that the Second Amendment is really protecting people who are law-abiding and responsible. And so states can impose requirements to ensure that a person who's seeking to keep and bear an arm is law-abiding and responsible. So you do background checks for law-abiding? Yes. And the federal law does that. And while they happen relatively quickly as a matter of practice, those can be up to three days, right? Correct. And up to 10 days for someone who's under 21. And this is, so does this impulse, this is about an impulse problem, right? People in some kind of crisis, impulse-related crisis, the notion is that with some delay, the impulse will pass, and that will make them what? It's not law-abiding. Would it be responsible, which is safe? I mean, is that your position? Yes. I think law-abiding, responsible, and I think another way to think of responsible is, is the person potentially dangerous with a firearm? And I think the undisputed scientific evidence, expert evidence in this case, is that there is this, especially with suicides, that this is an impulsive act, and if you can just delay even briefly the acquisition of a firearm, it meaningfully prevents suicide. So we look at footnote nine, which you mentioned, but we didn't really explore it. Footnote nine seems to be a precursor regulation to public carry. Before you can public carry, which is the bear, you must do these things. Take a class, let's just say, that shows you are a safe gun owner, and there's going to be a delay while you take that class and get your certificate, and you can't bear that gun in the way you want to until then. What your friends will say is the difference is, that is an individualized requirement that you must go get the certificate, and then once you do, you're cleared. In here, we don't get into that level of nuance. We say everybody must be qualified in the sense that they wait three days. Is that a significant difference in your mind? And I'm sure you're going to say not, so if not, why not? Yeah, it's not for two reasons. The first reason is that, for example, in the Bruin footnote, everyone has to take the firearms safety class, regardless of whether they can demonstrate that they personally are very responsible to the firearm. Everyone has to go through the background check, even if their background is clear. So the point is that the state can delay the exercise of the right until it's assured itself that the person is going to be law-abiding and responsible. The second response, Your Honor, is that there's no case that stands for the proposition that the only way that a state can make that assurance, to ensure that a person is law-abiding and responsible, is by some individualized assessment of the person. And so the only difference between the Maine law and the background check law, functionally, is that in the background check law, it's the results of the background check that determine whether the person's law-abiding and responsible. Under Maine's law, it's the fact that the person has waited three days and still wants to go through with a purchase that demonstrates that they're law-abiding and responsible. But I guess I don't see that direct, I don't see that as the conclusion. In the Shell Issue licensing laws, a purchaser has to take an affirmative act that indicates whether, or helps indicate whether they're law-abiding. Here, you just have to wait three days, whether you're law-abiding or not. You can then do whatever you want. And there's no other condition. Yeah, so, Your Honor, I mean, with a background check, though, you have to wait three days, potentially, or ten days, depending on how old you are, no matter how law-abiding and responsible you are. So, yeah. Well, let me ask you this. In Maine, before this, say we don't have this law at all, right? A regular purchaser over the age of majority wants to buy a firearm. They go to a firearm dealer, they do a background check. How long does that take? I think in most cases, it's incredibly fast. And that's all they do, right? You have the background check, and then you can purchase the firearm. Yes. I mean, assuming that the background check passes, and yes. So here, your argument is the waiting period is sort of a check in the box of law-abiding. And I guess I'm saying I don't really see that connection. Yeah, I mean, I'd maybe not focus on the law-abiding part. I think, really, we're getting to the check is, first of all, the sale is delayed for everyone. I mean, I think the Supreme Court has a limit. Take a firearm, taking a firearm safety class, which is likely going to result in a much longer delay. But the Supreme Court has made clear that states can delay sales or can delay the right until they've assured themselves the person's not dangerous. How does that rationale apply beyond the first gun? I'm sorry, Your Honor? How does the rationale apply beyond the first gun? Well, so two things, Your Honor. First of all, I don't think that there's any doctrine in the Second Amendment that says that the state has to sort of select the most narrowly tailored way to make sure that someone is law-abiding and responsible. But I think that the other response, Your Honor, is I suspect that that would have some just enforcement and compliance issues. Because I'm not sure how necessarily, you know, if I went to my local firearms dealer and said, oh, no, don't worry. I already have a gun. So I shouldn't have to wait. Like, I'm not sure if there's a way that the dealer, you know, could confirm that's the case. I don't think there's a registry of gun owners. And so I don't know that that could really be enforced effectively. And this applies to all sales, right? Private sales? No, no, it does not, Your Honor. It does not apply to all sales. It only applies to sales for which state or federal law requires a background check. And in Maine, that means that it's going to apply to federally licensed firearm dealers and to advertise sales or sales at gun shows. So if I'm simply a person... I mean, I guess that goes to another version of Judge Thompson's question, which I guess is it feels like Swiss cheese then to the interest that you've articulated. I mean, you could say, well, we can do whatever we want. But there's some limitation going on here. And I'm starting to think about to what end. If I'm having an impulse problem and the FFL won't sell to me, one is I have a... You've just said there are many other ways I can get a gun. Two, if I already have a gun, this impulse problem isn't going to be solved by this. So it seems to be taking sort of a sledgehammer to a lot of people who are likely going to be law-abiding and responsible and leaving a lot of people, or some people, who may not be out there to do whatever they... To cause the same harm. So it doesn't seem... It seems to cause a problem without much success potentially at its solution. Well, so two things, Your Honor. First of all, again, the evidence is that waiting... I'm sorry if I may just finish the answer. The evidence is that waiting periods work. So the fact that a person might already have a gun and can use that gun, still the evidence is that waiting periods reduce homicides and suicides. And to Your Honor's other question about the fact that this doesn't apply to every single sale, the most convenient way, so a person who's acting rashly is likely not going to try to find some local person who's not advertising a sale who might have a gun for available. They're going to act rashly by going to someone who they know sells guns. And that's the kind of sale that gets delayed by the waiting period. Can I circle back to where we began, which is on this question of the course of conduct and what Bruin tells us to look at? What is your position on what the course of conduct here is? I heard you say it's the immediate acquisition of firearms. That's sort of what our inquiry should... Yeah, I mean, I think what we would say is sort of the immediate acquisition of firearms is the course of conduct, but at the very least, it's the acquisition of firearms. It's not keeping and bearing firearms. That is not the conduct that's at issue here. It's the regulation of the acquisition of firearms. Correct, Your Honor. And so you would say the question we then need to ask is this violates or at least triggers further maybe history and tradition analysis if that acquisition of firearm regulation meaningfully interferes with the right to keep it bare? Yes, Your Honor. I think the Ninth Circuit test would be meaningfully interferes. I think another way of getting at it is to look at the Supreme Court cases, Bruin and Howler, and say whether it's either like being put to abusive ends or whether it in fact is preventing people from keeping and bearing. So that abusive ends, is that the intention of the government, the effect of the law on the keeping and bearing, exercising of the keeping and bearing? I mean, how much interference is there? How do I think about it? Because that is, you're right, those better use the Supreme Court than the Ninth Circuit's words. Those are the Supreme Court's words. So what do they mean? That's a good question, Your Honor. I'm not sure if the court meant that being put to abusive ends means that the government is intentionally trying to be abusive in it. But I don't think the court needs to get there because clearly here, the government was not, I mean, I think the record is replete with information about the main legislature's good faith effort to stop suicides and homicides. And I also think that just objectively... Back to my question a minute or two ago. I'm still thinking about this as pre to the Second Amendment. If the law may act in good faith, it has a real concern about this, but it is operating in a way that will capture and limit for three days the rights of people to keep and even when it is at stake, there are ways for people to get around it. Does it matter? I know not to do a means ends fit, but at this precursor stage, thinking about abusive ends, does something that's entirely overbroad and not well tailored constitute something that's abusive? Yeah. And again, we don't think this is any more overbroad than a requirement to take a safety class or to get a background check. Those are premised on the notion that every single person is potentially either not law-abiding or not responsible. I mean, I could be a SEAL and be an expert in firearms and I still have to take a safety course. Is that the point? That's the point, Your Honor. You could be the most honest, law-abiding, skilled person in the world, but you still might either have to submit yourself to a background check or take a safety class. I see my time has run out. Thank you very much. Thank you, Counsel. At this time, would Counsel of the Appellees please introduce herself on the record to begin? Good morning, Your Honors, and may it please the Court, Erin Murphy on behalf of the Plaintiff Appellees. Maine has enacted a law that forces everyone in the state to wait three days before they can acquire a firearm to keep and bear for self-defense in the home, even if they've already passed a background check confirming that they have no criminal or mental health history that might disqualify them from exercising Second Amendment rights. Maine didn't impose this law so that it can engage in some sort of additional investigation, some individualized determination. They say, and it makes some sense at least on a surface level to me, okay, yes, I have a clean history, but right now I'm in the middle of a crisis, and that is what we're trying to get at, and there is no good way to do that because people don't show up and say, I'm in a crisis, and we can't send them all to be evaluated. So Maine says, real problem, not clear what we can do about it. This is the best thing we can do to get at our responsible problem for people who are already law-abiding. These are the ones in a crisis. Sure, and I appreciate Maine's perspective on what it's trying to accomplish here, but it has to accomplish it within the boundaries of the tests that the Supreme Court has identified for restrictions on Second Amendment rights, and the reason it matters that they're not doing anything individualized, any type of extra investigation, whatever it is during the three days, is because Rahimi teaches that the tradition in this country is one of differentiating people who are not law-abiding, not in good mental health from those who are. The reason I take the safety class, right, is in Bruin's footnote 9. The reason I should take the safety class is we want to know that everyone knows where the safety lock is on the gun. We want everyone to know that. I may already know it, but we want everyone to know it and prove it with the certificate, and Maine thinks that by waiting three days, their science tells them that waiting three days for every person, we can give them a certificate that says they've waited three days, that has an indicia of proving responsibility, just like the class proves safety because they waited and their mental health crisis passed. That's their thought. And I understand their thought, but the problem is they have to square that with historical tradition, and historical tradition is one that has laws that say, here's how we're going to ensure that you are law-abiding. We might teach you safety, we may... The footnote 9 of Bruin seems to be talking about something that's a precursor to the Bering. Absolutely, absolutely. So it's outside of the history and tradition. It's precursor. Oh, no, no, no, no, no. I understand footnote 9 to be explaining why those types of regimes can be consistent with the Second Amendment. They're not outside the scope of it. Bruin itself was a case about a licensing regime, and the court didn't say, oh, that's a precursor to the Second Amendment analysis, so it doesn't apply here. Well, all right, keep going. So the reason footnote 9 is there is to say, of course, these background check regimes, licensing regimes, they always implicate the Second Amendment because they are the government saying you have to jump through certain hoops before you can exercise Second Amendment rights. Now footnote 9 is making clear that doesn't mean that they're all unconstitutional, but what it says is that... The presumption in those regimes is that people need safety classes in order to be responsible, and here they're saying that in order for us to tease out who has a crisis, then the remedy is to wait three days because statistically that's how you tease them out. Well, the problem is, again, it doesn't kind of fit with that historical tradition of doing something to ensure that someone... But they're saying that statistically it does ensure. We certainly do take issue with that, but even assuming they were right about that, the problem is at the end of the three days, everyone gets the firearm depending on whether they pass the background check. They don't know. They get the right to keep and bear. Right, but the point is the state has not assured itself that this mental health issue, violent impulse, they haven't done anything to assure that it's passed. Three days pass and you get the firearm based on whether you passed a background check that was conducted three days ago. They say one... Well, I have two questions. First, I think they're responsive, but one of the concerns has been as ameliorated or mitigated as best we can given the realities of just how life works, which is this is the best thing we can do to deal with an impulse mental health situation. Sure, and it just sounds a whole lot to me like they're making the kind of argument you made before Bruin. That argument isn't tethered to text. It isn't tethered to history. That gets to my second question then. So they frame this as an acquisition restriction that is precursor to keep and bear. So precisely your response to that is what? Why is that wrong? This is a restriction on possession by the state's own telling. The reason they have this law is so that people will not possess... Possession to have right now. That's what... Cannot possess it for three days. Now the right now... So I think Bruin is itself very instructive on how to think about the right now for purposes of the textual analysis, that threshold question. What the plaintiffs in Bruin wanted to do was carry firearms outside the home. And when the court asked the textual question, they didn't say, well, does the text specifically guarantee the right to carry outside the home? They in fact said the opposite. They said, well, you want to carry. And the text clearly allows carrying. And the text doesn't by itself say you can't carry outside the home. So if there's going to be any restriction on carrying outside the home, it has to come from historical tradition. I think that shows here too, what my clients want to do is possess a firearm, and they can't do it. Well, but again, you're adding right now, because they will possess it in three days. And that's fine. But I think if you follow the logic of Bruin, what you'd have to say is, is something in the text of the Second Amendment say that you can't, you know, that keep and bear means whenever the government's decided, you're entitled to keep and bear. All these regulations around acquisition, like background checks, you say, are Bruins, I understand they're presumptively constitutional or whatever, but they are okay because they satisfy Bruin prong to history and tradition, not their precursor. So you reject all these, the Ninth Circuit has sort of done the best to try to talk about this. The Ninth Circuit's most recent decisions actually have said that we are right. They just the other day struck down a background check regime on ammunition purchases. But I think if you look at footnote nine, the court specifically talks about the reason that those laws are going to be presumptively consistent with the Second Amendment is because they're focused on determining who is dangerous and who poses a danger with a firearm. And they're part of that tradition. About that footnote and your briefing in particular, because I thought your briefing was also saying, we know some conditions and qualifications under Bruin are presumptively lawful. This isn't a condition and you talk about the dictionary definition, but I'm wondering if it's a qualification. You didn't really address that in your briefing. Yeah, I don't think it's a qualification either because it's not like something I have to have, you know, a qualification, like I need to be qualified as a federally, you know, an FFL to be able to sell firearms. I don't think like me having waited three days kind of fits naturally into how we would think about a qualification. I think of like an act or an event that makes someone eligible and here it would be three days. Yeah, and it just seems much more naturally to me to think about a qualification as I took the class, I passed the background check, I qualified and simply saying you just can't have it until three days from now doesn't really seem to be a qualification. But I do want to be very clear, I mean, we don't actually, you know, we don't think the best reading of Bruin and Heller is that there's a true legal presumption in the sense that as long as it's a condition or qualification, that's kind of the end of, you know, that everything shifts. If you look at the way Bruin dealt in particular with sensitive places, so New York argued in Bruin that its licensing regime could be upheld as a sensitive places law. And the court responded to that not by saying, oh, you know, the whole burden shifts or we apply some different analysis or anything like that. It said, sure, we have accepted that there is a tradition of banning the carrying of firearms in sensitive places, but it's still New York's job to prove that its law fits within that tradition. And I think here too, the court has recognized, sure, there's a tradition of allowing conditions or qualifications on the commercial sale of firearm, but that doesn't get a state out of proving that its law actually does impose conditions or qualifications and does so in a manner that's consistent with that historical tradition. But the only way you're getting to qualification or condition, qualifications or conditions are presumptively lawful. And my thought was, okay, when they're saying that, what they mean is that's a pre-cursor to the right to keep and bear. What you're telling me is that every time that you put a time limitation on acquisition, you are by definition limiting someone's right to possess. That's the linchpin to what you're telling me today. As a textual matter, you've implicated the Second Amendment. Because? Because you have said you cannot exercise Second Amendment rights for a certain period of time. And that right is? To keep and bear a firearm. And if you are saying... And the part you added just is for a specific amount of time. You want to keep and bear a firearm, and the moment you want to do it, the state is telling you you can't. That implicates the Second Amendment. Now, that is not, it is certainly not our argument that every delay attended by a state law violates the Second Amendment. You would do a separate analysis of all of those, and some would be okay, and some wouldn't, and we'd look at history and tradition. And I think that's got to be right analytically, because again, Bruin itself was a case about a licensing regime. And so the very fact that Bruin was resolved on historical tradition, not the text, tells you, of course licensing... It was resolved on, it meaningfully interfered. It was a pre-cursor. It meaningfully interfered. And because it meaningfully interfered, we have to see, is that meaningful interference justified by the history and tradition? You will not find the words meaningfully interfered in the Supreme Court's discussion in Bruin of the textual analysis. That is a gloss the Ninth Circuit added onto it. But they do tell us to do some kind of step one analysis to see whether the restriction at issue is within the words keep and bear. They do tell us to do that. Yes, but I would point out the law in Bruin that was being challenged was not a ban on carrying a firearm. It was a restriction on getting a license to concealed carry a firearm. Yet when the Supreme Court analyzed it and said, what is the conduct in which the plaintiffs want to engage for purposes of the textual analysis, it treated the conduct as, they want to carry a firearm. It didn't treat it as, they want to acquire a license, they want to inherit... The conduct is acquire a firearm. It's possess. I mean, it really, I think you have to be, like, I think you don't have to give us that much because the way this law works, you can already have done the transaction. You are supposed to. It is the agreement to purchase that triggers the law. So literally, the only thing that this law is doing is saying you can't possess it. And that's the point of the law. And I just think it's really awfully hard for the state to come in and say, we're justifying this law on the ground, that we don't think people should possess a firearm for three days, and then turn around and say, oh, but this law doesn't implicate the right to possess a firearm. I mean, that just doesn't make any sense as a textual matter or as kind of just a logical matter. And again, all of this is only about whether the Second Amendment is implicated. I mean, it seems quite extraordinary to me to think that a law that singles out as the sole thing that is regulating the ability to possess a firearm wouldn't even implicate the Second Amendment. So we haven't done step two at all. So for now, I'll take it. Okay. So we're at step two. What is, they would say, so the intoxication laws and licensing laws, I think what you're going to say is those are individual specific. We have to make a determination about you, this person, they appear to be intoxicated,  And then we can apply that. And I think you would say this is different. But I guess, how do we account for the fact that this concern that is of a similar nature in the sense of the, I guess, the why, between the why and the how, I think, at least I'll accept that you all disagree, but except for a second, that it's the why. The hows do seem different, but they seem different in a way that I wouldn't know how to fix, because one is a problem maybe people can observe, and one is one that's riding under the surface.  And so I actually think the why really is different here and critically different, because the point, I mean, this is one of the things when Rahimi gets to its discussion of historical tradition, it repeatedly explains that the critical difference between a law like the one in Rahimi and a law like the one in Bruin is that one presumes people kind of do get to exercise Second Amendment rights, but that they can lose them by having engaged in specific behavior. That's Rahimi, whereas Bruin kind of just assumes like you don't get to exercise Second Amendment rights. What about these intoxication laws? So the intoxication laws fit very well within sort of the Rahimi tradition of if you engage in particular conduct, getting intoxicated, you forfeit temporarily your ability to carry a firearm. Someone who's under, I mean, you can reframe that. We observe someone who's under a condition caused by alcohol that makes them less safe with a gun, and we say you can't have that gun until that condition is relieved. It's not bad to be intoxicated, it's just that's what, you shouldn't have a gun when you're in that case. And Maine is saying you shouldn't have a gun when you're in a mental health crisis. The difference used to be one maybe we can see and one we can't. But the problem is Maine's law unquestionably applies without regard to whether people actually are in a mental health crisis. An intoxication law applies only if you're intoxicated. It would be quite different if Maine could point to a historical tradition of saying, you know, too many people in this jurisdiction drink on weekends, so nobody may carry a firearm Friday through Friday and Saturday. You know, that would be a law that is taking that kind of approach of we don't know for certain who it is who is intoxicated or not, so we'll just stop everybody. We don't see a historical tradition of doing that because our historical tradition says, no, we know. We don't always know who the criminals are, we don't always know who has mental health problems, but the Second Amendment says we err on the side of protecting the right of the law-abiding responsible individual, not on the side of, you know, saying they can't have a firearm because we're not sure who else might misuse it. The way Judge Aframe just asked that question, the step two analysis does seem to me, especially in terms of the intoxication laws, to get down to how you frame the question you want to ask. And I guess the thing that I'm really having trouble with is how do we know the question to ask? If we look at the intoxication laws with the question, the framing of both intoxication laws and this one here aimed to prevent irresponsible use of firearms, then we're right there, right with a historical analog. But if we frame it differently, I think the way you're asking us to frame it, then we aren't. Well, that's why I think it's critical to focus on both the how and the why. So the intoxication laws, you know, even if you thought maybe like the why has a similar, we want to deal with it when you're in a particular condition, the how is different. It's different in the same way that Rahimi said the how in Bruin was different from the how in Rahimi because... How do you prevent the problem that they're trying to prevent? I mean, I'm not here to tell you there's a perfect solution. We all recognize... What solution? You know, like work on the mental health databases. One of the problems that consistently is acknowledged is that some of the background check systems don't have as all of the information that they should have or have it completely up to date on the mental health front. And there's been incidents in the past where somebody got a firearm who shouldn't have because the information in the system was incorrect. That's a way that you try to address the problem. In situational crises. And in that case, they wouldn't be in a database. I understand. And I understand the point of the state's argument. But the problem with that argument is it has no stopping point because we never know who's going to, you know, we have ways to try to know who's likely to misuse a firearm, but we never know for sure who's going to misuse a firearm. And if so, the state could pass laws whenever it can come forward with some evidence that this law will be helpful because it will keep at least some of the people who would misuse a firearm from doing so. I mean, statistics, it's too small a statistical pool. No, what I'm saying is under Bruin, Bruin rejected the notion that states are supposed to say, what are your means? What are your ends? Are they a close fit? Do you have good statistics? Is this a good policy? Bruin said that's not how we're going to do Second Amendment analysis. We're not doing interest balancing. We're looking at text and we're looking at historical tradition. And so when the state comes in and starts with a lengthy argument about just we think this law accomplishes what we want to accomplish, I mean, I appreciate that argument, but it is completely untethered from what the Supreme Court has said Second Amendment analysis is supposed to be about. When we say we look at text and look at tradition, once again, we go back to there's nothing in the text of the Constitution that talks about acquisition of a firearm. So you're asking us to do a stretch in that area. I don't think we are at all because their law prohibits possession. It says you cannot possess the firearm for three days and possession is keeping. That is the very thing. And that is the point of this law. The state doesn't care about the acquisition in the sense of the transaction. They don't care if you already have legal title to the firearm during the three days. What they care about is whether you have it in your physical possession, which is the very thing that the text of the Second Amendment protects. So I think this really actually is... The Supreme Court says that laws that regulate the sale of guns are presumptively valid. What are we supposed to do with that? I don't think this law is really regulating the sale because the sale can have already taken place on day one. I mean, one of our plaintiffs here went in, purchased the firearm, paid the money, did all the things with the sale. The only thing she couldn't do is physically possess it, take it home with her to have it in her house. So this... They could rewrite that law to fix that, which can't be your answer. They could, and I still think ultimately, though, even if you just kind of change it and say do the sale at the end, the problem is what this law is about is not about the transaction. It's about the possession. And that makes it... I mean, this is for the textual purposes, but... It's an extended transaction. The... I mean, the... It won't work the payment, but the waiting period is part of the transaction under main law. Sure, but all it's doing is saying you can't possess. And I just don't see how a law that's saying you can't possess for a certain period of time could not implicate the right to possess a firearm. And again, this is just a question of whether it implicates it. Is there a point where you wouldn't argue that? Say if it was you can't possess for three hours or... Like, is there a... I think the right answer is if it's a state-imposed delay on the ability to possess, as a textual matter, that's a restriction on possession. And everything, these background checks, everything that... All of that stuff that will happen before the gun is handed to me, that is in your mind all a step two Bruin problem, not a step one problem. Yes, and I think that's why footnote nine says that even background check regimes could be unconstitutional. If they didn't implicate the Second Amendment's plain text at all, it would make no sense to say, but they may still well be unconstitutional if the delay is longer than necessary to conduct a background check, which that's exactly what this is. The delay is designed to be longer than necessary to conduct a background check, which takes a matter of minutes. This is a delay that's not tethered to conducting a background check. And footnote nine specifically, when it talks about lengthy waiting periods, is talking about them as how long of a waiting period do you need to process the license? So if you're imposing a waiting period for reasons that have nothing to do with processing the license, conducting the background check, but instead just make you wait, I think you're outside the scope of the historical tradition of having a law that helps you identify who is a law-abiding, responsible individual. Your time is up. Are there more questions? Okay. Thank you.  Thank you, Counsel. At this time, would Counsel for the Appellant please reintroduce himself on the record? He has a three-minute rebuttal. May it please the Court, again, Chris Taub for the Appellant. I think it's important to focus on the Bruin footnote because we reject the argument that the footnote is talking about the second prong of the Bruin test. If you look at the actual language of the footnote, what the Court actually says is that these shell-issue licensing regimes do not necessarily prevent law-abiding, responsible citizens from exercising their Second Amendment right to carry. So what that suggests is that what the Second Amendment protects is the right of law-abiding,  Tell me how you think Bruin analyzed the thing that was actually at issue in that case, which was the may carry. So if you were to walk me through using what we've called Bruin step one, step two, what was happening in the case itself in your mind? I think the reason that Bruin came out the way it did was because New York was requiring a special showing in order to exercise your Second Amendment rights. You couldn't just say I want a gun for self-defense, you had to show a special need for that. The way to think about that, that's a precursor to my right to carry, so it's not on its face a regulation of my right to carry, but it substantially or meaningfully interferes with it, and that's why we get into this historical discussion. I think in Bruin the issue was that this was not a law that was designed to ensure that only law-abiding, responsible citizens are allowed to carry a gun. It was a law that was designed to require a special showing, and so that's why it failed the first prong. But then what the court went on to say is that the reason that the shell-issue regimes are okay generally is because they're designed, and this is the language, are designed to ensure only that those bearing arms in the jurisdiction are in fact law-abiding, responsible citizens. And so, again, the Fourth Circuit, the Fifth Circuit, the Ninth Circuit, and even the most recent decision, I mean, the Ninth Circuit cases are kind of all over the place a little bit, hopefully we'll get an en banc decision sooner or later, but even the most recent Ninth Circuit panel decision recognized that... Your friend would say that's because there's a historical tradition for such, and is that where you part ways with her? Not only do we part ways, but those cases are clear on their face. All of those cases say, so we don't have to get to the second step because these laws don't implicate the plain text of the Second Amendment. I mean, the cases themselves say that. And so, and, you know, to the extent that the EPLI is relying on Rahimi, that was a there's no dispute, no dispute whatsoever that a law that prohibited... In Heller's, a prong two case, right, in McDonald there is a prong two case. I guess Bruin's the one I struggle with. You're telling me it's a prong two case because as I look at that regulation, it is a discretionary limitation on the right to carry? It was a discretionary limitation that wasn't designed to... That law abiding and... Law abiding and responsible, yes. But any regulation that goes, that is targeted at law abiding and responsible that is a precursor to the actual conduct of keeping or bearing is not within the Bruin step two. We don't do the historical tradition unless we think it meaningfully interferes or something like that. Yes, some test of abusive, meaningfully interferes, effectively prohibits, something like that. Thank you. Thank you. Thank you. I would like to move the argument in this case.